KB-2492
**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
25 Main Street
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Telecopier
Attorneys for Petitioning Creditors

| | |
|---|---|
| In the Matter of: : | UNITED STATES BANKRUPTCY COURT |
| : | FOR THE DISTRICT OF NEW JERSEY |
| KIDS.COM LLC, : | HON. NOVALYN L. WINFIELD |
| : | CASE NO. 04-45797 (NLW) |
| Debtor. : | |
| : | Chapter 7 (Involuntary Petition) |

**CERTIFICATION OF JEROME ASHFIELD (i) IN OPPOSITION TO DEBTOR'S MOTION TO DISMISS INVOLUNTARY PETITION AND FOR OTHER RELIEF AND (ii) IN SUPPORT OF PETITIONING CREDITORS' CROSS-MOTION FOR SUMMARY JUDGMENT ON INVOLUNTARY PETITION**

**HEARING DATE: DECEMBER 9, 2004**

JEROME ASHFIELD, of full age, pursuant to 28 U.S.C. § 1746, certifies under penalty of perjury as follows:

1. I am a shareholder of and partner in, respectively, National Talent Associates, Inc. ("NTA"), and A & S Holding Co. ("A & S"), two (2) of the four (4) creditors that filed the Involuntary Chapter 7 Petition ("Involuntary Petition") in this matter (each individually, "Petitioning Creditor," and collectively, "Petitioning Creditors"). I am familiar with the facts and circumstances described herein and am authorized to make this Certification (i) in opposition to the motion of KIDS.COM LLC ("KIDS.COM" or the "Debtor") to dismiss the Involuntary Petition and for other relief ("Motion"), and (ii) in support of the Petitioning Creditors' cross-motion for summary judgment on the Involuntary Petition ("Cross-Motion").

## INTRODUCTION

2. I formed NTA, which was in the children's modeling agency business, in 1966. I successfully operated the business until July 1999, when I sold NTA's business to the Debtor, which was formed by Alfred Bagwell. The sale price of $350,000.00 was to be paid through a down payment of $20,000.00 and a promissory note in the amount of $330,000.00 for the balance due (the "Note"). As Alfred Bagwell acknowledges in his Certification in support of the Motion ("Bagwell Cert."), based on my thirty-eight (38) year relationship with him, I did not require the debt to be collateralized against KIDS.COM's assets or personally guaranteed by Mr. Bagwell.

3. Unfortunately, Mr. Bagwell and the Debtor utilized this accommodation to their advantage by failing to make a balloon payment due on the Note, in the amount of $191,555.86, in July 2004. After the Debtor refused to cure this default, NTA was forced to file suit against the Debtor in August 2004, in the Superior Court of New Jersey, to collect the balance of the monies due under the Note (the "Collection Action").

4. The Debtor never filed an answer, or otherwise contested the allegations in NTA's Complaint, in the Collection Action. Instead, just days before NTA obtained the entry of default against the Debtor in that action, the Debtor commenced what it describes as "insolvency proceedings" in the Superior Court of New Jersey, pursuant to a Deed of Assignment for the Benefit of Creditors (the "Assignment Case"). In the Assignment Case, the Bagwells are seeking to effectuate the sale of the Debtor's business, which generated an average annual gross income of $3,328,905.30 million during the years 2001-2003, to an entity owned and operated by the Bagwells, for the cash price of only $25,000, plus assumption of a $69,500 alleged secured debt that, upon information and belief, is personally guaranteed by Alfred Bagwell. Given this blatant attempt to "cleanse" KIDS.COM of the valid debts of NTA, A & S, and the other Petitioning Creditors, while KIDS.COM continued to pay the debts of other creditors **after the Assignment Case was filed**, the instant Chapter 7 proceeding was commenced.

5. In its Motion, the Debtor expansively and inaccurately describes my prior dealings with the Federal Trade Commission, and somehow blames those dealings for KIDS.COM's failure. My dealings with the FTC, however, have no relevance to these proceedings. The Involuntary Petition was filed because the Debtor owes substantial sums of money that it simply refuses to pay, and because it attempted to relieve itself of those debts, while retaining the company for the Bagwell family. In the meantime, since the Involuntary Petition was filed, the Debtor, according to its counsel, has paid various pre-petition debts in violation of the automatic stay.

6. In addition to the foregoing improper actions by the Debtor, there are numerous questions regarding the conduct of the Debtor's business in recent years, including unpaid employee loans that are not listed as assets, excessive automobile and other miscellaneous

expenses, potential preferential and fraudulent transfers, and prior loans made to the proposed purchaser of KIDS.COM's assets, KIDMODELS LLC, that were never collected and written off as a "bad investment." The Debtor should not be permitted to return to State Court and engineer a fast sale of its assets, which benefits only the Bagwell family. Only a Chapter 7 Trustee, with broad investigative and avoidance powers, can make the necessary inquiries in this case and ensure that the rights of all creditors are being protected. Accordingly, the Court should deny the Debtor's Motion and grant the Petitioning Creditors' Cross-Motion for summary judgment on the Petition.

## BACKGROUND

### A. The Sale Of NTA's Business To The Debtor.

7. In July 1999, NTA sold its business to KIDS.COM (the "Sale"), an entity that was created in June 1999, solely for the purpose of that transaction. It should be noted that, contrary to Alfred Bagwell's statement that "every effort was made to segregate Kids.Com from the reputation of NTA" (Bagwell Cert. at ¶ 7), all of the company's offices remained at the same addresses, with the same personnel and the same telephone numbers.

8. The purchase price for NTA's assets was $350,000 (the "Purchase Price"). The Debtor was to pay $20,000.00 at closing, with the remaining balance to be paid pursuant to the terms of a Promissory Note in the amount of $330,000.00, dated as of July 14, 1999 ("Note"), a true copy of which is annexed hereto as Exhibit A. The Note provides for a sixty (60) month payment term, from July 14, 1999, through July 1, 2004, although payments were based on a ten (10) year amortization schedule. (Note at ¶ 2.) Payments of interest only, at a rate of eight percent (8%) per annum, were to be made on a monthly basis commencing on August 1, 1999,

4

and continuing through January 1, 2000. (Note at ¶ 3.) Beginning on February 1, 2000, and continuing through June 1, 2004, the Debtor was to make payments of principal and interest in accordance with an amortization schedule to be prepared in July 2000. On July 1, 2004, the remaining principal balance, plus all accrued and unpaid interest, was due. (Note at ¶ 5.)

9.　　　At no point from the sale of the business through the maturity of the balloon payment, had KIDS.COM or the Bagwells raised any claim related to the Sale.

### B. The Debtor's Debt To NTA.

10.　　　A material provision of the Note was that it could not "be changed or waived orally, but only by an instrument in writing signed by the party to be charged by such change or waiver." (Note at ¶ 14.) This is particularly relevant in light of Alfred Bagwell's creative and disingenuous attempt in his Certification to prove a series of adjustments to the Purchase Price.

11.　　　First, Mr. Bagwell claims that because two (2) checks from NTA to KIDS.COM, each dated July 14, 1999, and each in the amount of $20,000.00, which were purportedly part of the assets included in the Sale, were not able to be deposited in KIDS.COM's account, the amount due under the Note was reduced from $330,000.00 to $290,000.00. (Bagwell Cert. at ¶ 9.) In fact, as of July 1, 1999, when KIDS.COM began operating NTA's business, but before the Sale was completed, the funds in NTA's checking account, which was to be included in the Sale, totaled approximately $51,000.00. Alfred Bagwell advised me that because KIDS.COM could not access those funds, deposit the approximately $108,000.00 in post-dated checks held by NTA from its clients, or draw down upon them, KIDS.COM would have no working capital for a period of approximately two (2) weeks. Mr. Bagwell requested that I allow KIDS.COM to draw

5

upon the $51,000.00. I agreed and wrote the checks on NTA's checking account that are referenced in the Bagwell Certification.

12. I soon discovered, however, that a former employee of NTA, who had check-writing authority for the company and continued to work for KIDS.COM, already drew down on the $51,000.00 in NTA's account. As a result of this unauthorized use, the $50,000.00 in checks I provided to Mr. Bagwell could not be cleared by NTA's bank. In any event, because (i) NTA transferred <u>all</u> of the monies it was required to provide pursuant to the Sale, (ii) the failure of any checks to clear NTA's account was caused by KIDS.COM's unauthorized use of funds in that account, (iii) I never agreed to any adjustments to the Purchase Price, and (iv) the Note prohibits any oral adjustments, Mr. Bagwell's statement that the Purchase Price was reduced to $290,000.00, is false.

13. Mr. Bagwell's claim of further adjustments to the Purchase Price is similarly untrue. Mr. Bagwell alleges adjustments in KIDS.COM's favor, for paying certain of NTA's obligations ($23,589) and an erroneous credit given by KIDS.COM's bank to NTA ($27,259); and in NTA's favor, for interest due on the Note from July through December 1999 ($11,237.00), rent owed by KIDS.COM to A & S ($39,540.00), which I purportedly agreed to be paid to NTA instead, and payroll made by NTA on KIDS.COM's behalf ($15,526.00). (Bagwell Cert. at ¶ 12.) These attempted adjustments which, if accurate, would result in the Note having a face value of $306,000.00, are baseless.

14. First, I never agreed to any of these items, and the Note specifically prohibits KIDS.COM from making them orally and unilaterally. Second, the latter three (3) adjustments are all based on debts that could have only accrued <u>after</u> the closing of the Sale; therefore, it

6

would have been impossible for them to be attributed to the closing in July. Third, I never instructed Mr. Bagwell to pay rent owed to A & S, directly to NTA. Thus, Mr. Bagwell's claims regarding adjustments to the Note are absolutely false. **The amount due under the Note, as the Note itself states, was $330,000.00.**

15. Despite Mr. Bagwell's misinformation, the Debtor candidly acknowledges that as of June 2004, it owed NTA the sum of $191,556. (Bagwell Cert. at ¶ 13.) As the Debtor also acknowledges, this is the sum that NTA sought to recover in the Collection Action. (<u>Id</u>.) It is also the sum listed by the Debtor in the schedules to its Deed of Assignment for the Benefit of Creditors. Therefore, there is no dispute that NTA holds a valid debt against the Debtor in the amount of $191,556.00.

### C. The Debtor's Debt To A & S.

16. The Debtor's claim that its debt to A & S for rent was subsumed within the Note, is preposterous. A & S leased space to the Debtor at the following locations: 186 Fairfield Road, Fairfield, New Jersey; 40 Railroad Avenue, Valley Stream, New York; and 6326 No. Lincoln, Chicago, Illinois (collectively, the "Locations"). The Debtor did not occupy the Locations until July 1999, after the Sale was completed and, therefore, did not begin accruing rent obligations until that time. Because it would have been impossible for any rent to accrue before the Debtor's use and occupancy of the Locations, it would have been similarly impossible for a $39,540.00 debt for rent to have been included as an adjustment to the Note. In any event, by the time the Debtor vacated the Locations in January 2000, the Debtor had accrued a total of $40,467.82 in unpaid rent, taxes and other related charges owed to A & S. That sum remains due and owing from KIDS.COM to A & S.

41993/0001-1369984v1

17. The Debtor's claim that NTA and A & S are one and the same entity is absolutely false. From the time each entity was formed, NTA and A & S have had separate tax identification numbers, filed separate tax returns, and maintained separate books and records. These companies, contrary to the Debtor's baseless allegation, have not commingled their assets with one another and have not engaged in any practice of paying each other's debts. Therefore, NTA and A & S each have separate standing to assert claims against the Debtor and prosecute the Involuntary Petition.

### D. The Collection Action.

18. On or about August 5, 2004, NTA commenced the Collection Action by filing a Complaint and Jury Demand ("Complaint") with the Superior Court of New Jersey, Law Division, Passaic County, which was docketed as PAS-L-3332-04. (A true copy of NTA's Complaint is annexed hereto as Exhibit B.) In the Complaint, NTA sought to collect the sum of $191,555.86 from the Debtor, based on the Debtor's default under the Note.

19. Although the Complaint was served on August 27, 2004, on the Debtor's counsel who accepted service on his client's behalf, the Debtor never filed an answer to the Complaint. Thus, on October 14, 2004, NTA filed a Motion For Entry Of Default Against Defendant in the Collection Action. (A true copy of that Motion is annexed hereto as Exhibit C.) On November 5, 2004, the Court in the Collection Action entered an Order Entering Default Against Defendant, a true copy of which is annexed hereto as Exhibit D. That Order has not been appealed.

### E. The Assignment Case.

20. On October 8, 2004, the Debtor executed a Deed Of Assignment For The Benefit Of Creditors Of KIDS.COM, LLC ("Deed of Assignment"), pursuant to which it assigned all of its assets to Steven Z. Jurista, Esq. (the "Assignee"). (A true copy of the Deed of Assignment is annexed hereto as Exhibit E.) The Deed of Assignment lists assets totaling $19,000.00, including equipment valued at $12,000.00, although no appraisal was or has been given to support that amount; a bank account containing $1,000.00; loans made to undisclosed employees in the amount of $6,000.00, which are purported to "have no future value," with no further explanation; and accounts receivable totaling $130,000.00,[1] "from new clients for future services to be delivered." (Deed of Assignment at Schedules A, B, C, and E.)

21. The Deed of Assignment also lists the Debtor's numerous liabilities. These debts include: wages, salaries, and commissions owed to two (2) members of the Bagwell family, in the aggregate amount of $55,476.00, as well as other "Commission Reserves" in the amount of $23,000.00; contributions to employee benefit plans totaling $17,039.66; a secured debt to Commerce Bank NA in the amount of $69,500.00 (the "Commerce Debt"); and forty-eight (48) different unsecured debts totaling $325,795.51. (Deed of Assignment at Schedule of Liabilities.) Although the debts of both NTA, which is easily the Debtor's largest liability, and Petitioning

---

[1] KIDS.COM, like NTA, generates receivables through post-dated checks and credit card transactions. During the time that NTA operated its business, it was typical for the company, at any given time, to have accounts receivable attributable to credit card transactions in the amount of approximately $108,000.00, without accounting for post-dated checks. Based on my review of KIDS.COM's books and records, it appears that the company is generating credit card of receivables of approximately $30,000.00 per week. Based on those figures, the Debtor's stated amount of accounts receivable totaling $130,000.00 seems extremely understated.

9
41993/0001-1369984v1

Creditor, Classic Coffee Systems Ltd., are included, the debts of A & S and Petitioning Creditor, David Laurino, are improperly omitted.

22. On or about October 14, 2004, the Assignee served the Debtor's creditors with a set of documents including, among other things, a Verified Complaint Of Assignee For Order To Show Cause Authorizing Assignee To Enter Into Temporary Use Arrangement Pending Notice, Processing And Approval Of Agreement To Purchase Assets ("Verified Complaint"), and an Order To Show Cause Authorizing Assignee To Enter Into Temporary Use Arrangement For Assets Pending Process And Approval Of Offer To Purchase Assets And Fixing Hearing Date For Approval And Confirmation Of Sale ("Order To Show Cause). (True copies of the Verified Complaint and Order To Show Cause are annexed hereto collectively as Exhibit F.)

23. Pursuant to the Verified Complaint, the Assignee sought court approval of a proposed sale of KIDS.COM's assets to KIDMODELS, LLC ("KIDMODELS"), free and clear of all liens and encumbrances except the lien of Commerce Bank ("Commerce"), for the cash price of $25,000 and the assumption of Commerce's secured debt of $69,500 (the "KIDMODELS Sale"). According to the Verified Complaint, KIDMODELS is an "insider whose principals, officers and directors are related to the principals, officers and directors of [KIDS.COM]." (Verified Complaint at p. 6, ¶ 14.) The Order To Show Cause, which was entered by the court in the Assignment Case on October 14, 2004, fixed a November 9, 2004, hearing date for the KIDMODELS Sale.

24. NTA filed a memorandum in opposition to the KIDMODELS Sale, arguing, among other things, that the Verified Complaint does not include a list of the assets actually being sold; there is no appraisal to support the purported value of KIDS.COM's assets; and there

41993/0001-1369984v1

was no evidence that the assets were properly marketed. (A true copy of the Memorandum Of National Talent Associates, Inc., In Opposition To Assignee's Motion For An Order Approving Sale Of Assets, is annexed hereto as Exhibit G.)  A & S also filed its own memorandum in opposition to the KIDMODELS Sale, in which it adopted and reiterated the arguments in NTA's memorandum. (A true copy of the Memorandum Of A & S Holding Co. In Opposition To Assignee's Motion For An Order Approving Sale Of Assets, is annexed hereto as Exhibit H.)

25. In furtherance of its objection to the KIDMODELS Sale, NTA sought discovery from KIDS.COM by serving Subpoenas on Alfred Bagwell and his son, John Bagwell, who executed the agreement for the KIDMODELS Sale on behalf of KIDMODELS. (True copies of the Subpoenas Duces Tecum Ad Testificandum ("Subpoenas") are annexed hereto collectively as Exhibit I.)  Pursuant to the Subpoenas, NTA reviewed various documents in KIDS.COM's possession at its offices in Fairfield, New Jersey, on November 3 and 4, 2004.

26. NTA's document review unearthed numerous questionable transactions and issues in connection with KIDS.COM's conduct of its business.  First, although KIDS.COM's Federal tax returns for the years 2001-2003 reflect an average annual gross income of $3,328,905.30 million, the company only generated an average net income of $81,847.00 for those years. (True copies of KIDS.COM's Federal tax returns for the years 2001, 2002, and 2003 are annexed hereto collectively as Exhibit J.)  Those same tax returns, as well as KIDS.COM's corresponding general ledgers, list annual automobile and related expenses in an excessive average amount of $106,054.00.  The company also lists unexplained miscellaneous expenses for those same years, in an average annual amount of $66,077.67. (True copies of selected portions of KIDS.COM's General Ledger Activity Reports for the years 2001, 2002, and 2003 are annexed hereto collectively as Exhibit K.)

27. In addition, KIDS.COM's records reflect that it loaned $170,632.00 to KIDMODELS in 2001 and 2002. That loan was never repaid. Instead, KIDS.COM wrote off $102,032.00 of the debt, and inexplicably transferred the remaining 68,600.00 balance to Alfred Bagwell's loan account with the company. (*See* selected portions of General Ledger Activity Report for the period January 1, 2001, through December 31, 2003, true copies of which are annexed hereto as Exhibit L.) Mr. Bagwell's loan account reflects a balance due and owing in the amount of $29,357.66 as of September 30, 2004, which is not listed as an asset in the Deed of Assignment, and is apparently not being pursued by the Debtor. (Id.) Similarly, a portion of KIDS.COM's general ledger entitled "Loans to Employees" reflects a debt owing to the company by unnamed employees, in the amount of $39,097.89. (*See* selected portion of General Ledger Activity Report for the period January 1, 2001, through September 30, 2004, a true copy of which is annexed hereto as Exhibit M.) Again, there is nothing in the Deed of Assignment to suggest that KIDS.COM considers this receivable an asset, nor does it appear that the company is pursuing collection from the anonymous account debtor(s).

28. It would appear that these exorbitant expenses caused a substantial reduction in KIDS.COM's net income, and diluted the company's true value as a going concern. At a minimum, KIDS.COM is worth significantly more than the $25,000 cash, plus assumption of the Commerce Debt, which is believed to be personally guaranteed by Alfred Bagwell, that KIDMODELS is proposing to pay. Moreover, the existence of these suspicious transactions between KIDS.COM, members of the Bagwell family and companies controlled by them, warrants a comprehensive forensic investigation into potential claims that can be asserted on behalf of the company's creditors.

12
41993/0001-1369984v1

### F. The Involuntary Petition.

29. All of this information confirmed my suspicion that the Assignment Case and the KIDMODELS Sale were an exercise geared to maintain KIDS.COM's business for the Bagwell family, while relieving the company of its debts and shielding it from an investigation into its prior practices. Shortly after I reviewed KIDS.COM's books and records, I learned that KIDS.COM was not only continuing to operate its business, ostensibly pursuant to the Order To Show Cause entered in the Assignment Case, but was also paying many of the debts that were listed in the Deed of Assignment. I then decided that NTA and A & S, together with other creditors, should file the Involuntary Petition.

30. The Involuntary Petition was filed on November 10, 2004. After that date, I learned from NTA's and A & S' counsel that the Debtor was continuing to pay its pre-petition debts, in an apparent violation of the automatic stay. (*See* e-mail from Gary Norgaard, Esq., to Kenneth L. Baum, Esq., dated November 18, 2004, a true copy of which is annexed hereto as Exhibit N.) This disregard for the law, together with the above transgressions by KIDS.COM and its owners, illustrates why the <u>immediate</u> appointment of a Chapter 7 Trustee is necessary.

31. NTA and A & S filed the Involuntary Petition not for any abusive purposes, but to prevent the Debtor and the Bagwell family from using the judicial system to cleanse their company of its most substantial debts, repurchase it for a grossly insufficient sum, and keep their questionable conduct shielded from a proper inquiry . Accordingly, the Court should deny the Debtor's Motion and grant the Petitioning Creditors' Cross-Motion.

## **CERTIFICATION**

I hereby certify under penalty of perjury that the above facts are true and correct to the best of my knowledge and belief.

*/s/ Jerome Ashfield*
JEROME ASHFIELD

DATED: December 6, 2004